Nikki Suites LLC v Hale (2025 NY Slip Op 50467(U))

[*1]

Nikki Suites LLC v Hale

2025 NY Slip Op 50467(U)

Decided on April 10, 2025

Civil Court Of The City Of New York, Kings County

Weisberg, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 10, 2025
Civil Court of the City of New York, Kings County

Nikki Suites LLC, Petitioner,

against
Timothy Deonte Hale, ET AL., Respondents.

Index No. 302792/24

Michael L. Weisberg, J.

The following e-filed documents, listed by NYSCEF document number 31-36 (motion no. 7) were read on this motion for, in effect, an extension of time to pay the arrears and to be restored to possession of the apartment.
The facts of this case are rather typical. Respondent, a disabled veteran of the United States Armed Forces, was evicted from the rent-stabilized premises after failing to pay the rent arrears required by the parties' agreement and multiple court orders.[FN1]
 On March 4, 2025, the court granted Respondent's first motion to be restored to possession if he paid rent arrears and legal/marshal fees totaling $38,903.00 by March 25, 2025 (NYSCEF Doc. 26).
As discussed more fully below, on March 25th the Department of Social Services had in [*2]fact issued checks for nearly the full amount required, though as of this writing the checks had still not been delivered to Petitioner. Nonetheless, on the order to show cause herein the court ordered that Respondent be restored to physical possession of the apartment pending the hearing of the motion. Because there is "good cause" (RPAPL 749[3]) for Respondent to be restored to possession, the court now grants the motion and orders that Respondent be restored to legal possession upon payment of the amount required by the last court order, plus April 2025, and denies Respondent's request for payment of additional legal fees.
PROCEDURAL BACKGROUND
On March 25th, the deadline for Respondent to pay the rent arrears and fees so that he could be restored to possession, he moved to extend his time for compliance (NYSCEF Doc. 27). The motion was supported by a letter from the Riseboro Community Partnership indicating that Respondent was a military veteran, had been working with Riseboro to obtain payment of the arrears, had been approved by the Department of Social Services for payment of rent arrears, and that they were waiting for the checks to be delivered by DSS to its office. The motion was granted insofar as it extended Respondent's time to pay but required an additional $300.00 payment for legal fees (NYSCEF Doc. 30). The order required payment of $39,203.00 by March 31st (id.).
By March 31st the checks had still not been delivered to Petitioner or to DSS's courthouse office. Respondent again moved to extend his time to pay so that he could be restored to possession of the apartment (NYSCEF Doc. 31). He appeared in court with a copy of an approval for payment by DSS of $34,903.00 and certified bank checks totaling $4,300.00, for a total of $39,203.00. He also had a page from a DSS benefits printout indicating that the checks had been "issued" on March 25th. This court signed the order to show cause and, because Respondent's checks and the DSS approval, ordered Petitioner to restore Respondent to physical possession of the apartment immediately, pending the hearing of the motion.
Pursuant to CPLR § 5704(b), Petitioner appealed that portion of the order to show requiring it to restore Respondent to possession (NYSCEF Doc. 32). The Appellate Term declined to reverse the order.
On the return date of the motion the DSS checks had still not been delivered to Petitioner. An attorney from DSS was in the courtroom, in connection with other proceedings with extensive DSS delays in determining tenants' applications for assistance for which the court had required DSS's appearance. DSS counsel was able to discern that the checks were still in the possession of DSS. He reported that he made arrangements for the checks to be delivered to the courthouse DSS office within a few days, whereupon he would be notified of their delivery, pick them up, and have them delivered to Petitioner.
DISCUSSION
As described by Justice Saxe in his concurrence in Matter of Lafayette Boynton Hsg. Corp. v Pickett (135 AD3d 518, 523 [1st Dept 2016]), "the initial case law that allowed already-evicted tenants to be restored to their tenancy applied a standard of 'appropriate circumstances,' while subsequent cases permit a tenant's restoration after eviction for 'good cause shown,' which standard is satisfied by good faith and eventual successful efforts by a long-term tenant to satisfy his or her rent obligation, despite hardships. In addition, some recent cases suggest that on appeal the trial court's decision must be given the substantial latitude of an abuse of discretion standard of review."
Justice Saxe also observed that "because the statutory standard of proof to vacate a warrant of eviction before the warrant is executed is 'for good cause shown' (RPAPL 749[3]), one might expect that a more exacting standard should be employed where a tenant seeks to be restored to possession after eviction, since the landlord-tenant relationship had already been terminated at that point, eliminating the tenant's rights to reside in the leased premises" (id. at 522 [emphasis in the original]). However, the Housing Stability and Tenant Protection Act of 2019 (L 2019, ch 36) has dated this observation in three respects. First, the HSTPA amended RPAPL 749(3) to make the "good cause" standard applicable to post-execution scenarios. Second, the HSTPA amended RPAPL 749(3) to remove the provision that stated that "the issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises." Finally, and most significantly, the HSTPA severely limited an owner's opportunity to increase the rent through individual apartment increases and eliminated an owner's ability to remove an apartment from rent stabilization coverage through rent increases.
The changes regarding deregulation and rent increases surely shifted the premise under which many owners operate. Rent stabilization often acted to keep rents lower than that which an apartment could rent for in the free market. Pre-HSTPA, an owner of one of those apartments might rationally desire for a tenant of subject apartment to vacate, whether voluntarily or as the result of an eviction proceeding, so that the owner could make certain improvements to the apartment that would entitle it to a large rent increase. Depending on the rent at the time of the improvements and the scope of the improvements, the increase could result in a higher (but still stabilized) rent or might even allow the owner to deregulate the apartment and rent it for whatever the market would permit.
Under this pre-HSTPA scenario, once a tenant was evicted the owner might have strong incentive to deny them the opportunity to regain possession, even if it meant walking away from imminent (or, more likely, soonish) payment of even twenty or thirty thousand dollars. Post-HSTPA, the value of a vacant apartment is a lot less. Most of the time it will be rented to the next tenant with a rent increased by only a few percentage points (HSTPA also eliminated so-called "vacancy increases"). It almost certainly won't be deregulated. Thus, absent other factors (e.g. the tenant is otherwise a nuisance, the owner has a family member it wants the apartment for, the owner would rather take its chances with another, heretofore unknown, tenant who might never fall into rent arrears), much of the time it will probably make sense for the owner to agree to additional opportunities for the tenant to pay the arrears and maintain the tenancy.
Here, Petitioner makes no specific argument as to why Respondent should not be restored to possession upon payment of the arrears, other than to basically argue that it just took too long to get paid. The court is not minimizing this concern (see Matter of Lafayette Boyton Hsg. Corp., 135 AD3d at 525 ["Since it has no choice but to wait however long it takes for the rent to be fully paid—here, the landlord waited two years—without any interest being paid on the unpaid rent, it is in effect forced to underwrite the tenancy"]). It does take "too long" for owners to get paid in almost every nonpayment summary eviction proceeding. As noted in footnote one, the timeframes that parties often agree to for payment of rent are usually completely arbitrary. Unlike settlements in other civil actions, where presumably the party incurring obligations has actual control over its ability to comply with the terms of the settlement, nonpayment summary eviction cases typically revolve completely around the question of when and whether DSS will [*3]pay the arrears.[FN2]

This court has often remarked that, ideally, a representative from DSS with some kind of authority should be present in every courtroom. Short of that, at least for those situations when a tenant is requesting a court order extending their time to pay arrears, the court should be able to easily reach a representative from DSS who could explain with exactitude the status of the application, what steps are required (if any) for the application process to move forward, and the timeframe for that process.[FN3]
 For those situations where a tenant's arrears are higher than what DSS will/can/wants to pay, it makes sense to this court for DSS to negotiate directly with the owner (it does not), rather than instruct (as is typical) the tenant to "lower arrears owed." How exactly does DSS expect a low-income New Yorker to do that, particularly when the proceeding is already at a point where the tenant is on the cusp of eviction?[FN4]

CONCLUSION
Considering the foregoing, the court finds that there is good cause sufficient to restore Respondent to possession of the apartment. Petitioner will be paid all the rent through March 2025 as well as almost all its alleged legal fees. Respondent will also be required to pay April rent. The court declines to require the payment of any additional fees. It is worth noting that while prior cases have noted that the owner being "made whole" is a factor that appellate courts have considered when reviewing a court's decision to restore a tenant to possession post-eviction (e.g. 591 Realty, LLC v Jenkins, 85 Misc 3d 131[A] [App Term, 1st Dept 2025]), no appellate [*4]court that this court is aware of has made that a factor sine qua non.
Accordingly, it is ORDERED that the motion is granted as set forth below; and it is further
ORDERED that upon payment of both $34,903.00 in DSS checks and rent for April 2025 by April 30, 2025, Respondent shall be restored to legal possession of the premises and the warrant deemed vacated (Respondent already tendered the certified bank checks reference above for $4,300.00 in open court); and it is further
ORDERED that Petitioner may re-execute the warrant of eviction if it does not receive the DSS checks totaling $34,903.00 and rent for April 2025 by April 30, 2025, provided that Petitioner must first notify Respondent and file proof of such notification on NYSCEF if it does not receive the DSS checks by April 15, 2025.
This is the court's decision and order.
Dated: April 10, 2025
Michael L. Weisberg, JHC

Footnotes

Footnote 1: The record reveals nothing out of the ordinary in the procedural history of the proceeding. Almost every tenant in Housing Court is dependent on the Department of Social Services to pay their rent arrears. Delays or difficulties with obtaining a "timely" response from DSS are well known. So are stories of tenants waiting at their local "income support center" or on hold with DSS for hours and hours, as well as complaints that DSS has denied applications and told tenants that it never received their application documents despite those documents having been uploaded via the DSS "Access" smartphone application, or DSS requiring a tenant to get a renewal lease (which only serves to increase the rent), when the tenant is rent-stabilized. Viewed from this perspective, and especially because DSS almost never appears in court to explain under what circumstances and when it will pay rent arrears, dates for payment agreed on by the parties or ordered by the court are largely arbitrary.

Footnote 2: And DSS does pay, to the tune of hundreds of millions of dollars each year. Pre-COVID, excluding payments made pursuant to programs such as FHEPS, CityFHEPS, and SEPS, DSS paid an increasing amount of rent arrears each year, from $124.1 million for 42,000 households in fiscal year 2013, to $180.7 million for 53,000 households in fiscal year 2015 (Banks testimony, 3/15/16, 
https://www1.nyc.gov/assets/hra/downloads/pdf/news/testimonies/2016/mar/HRA%20Prelim%20FY17%20hearing_FINAL.pdf), to $214 million for 58,100 households in calendar year 2016 (Banks testimony, 3/27/17, 
https://www1.nyc.gov/assets/hra/downloads/pdf/news/testimonies/2017/mar/HRA_Prelim%2018%20testimony_FINAL.pdf). Post-COVID, where it is not atypical for a tenant to owe arrears of $30,000, the annual amount paid by DSS is surely much higher.

Footnote 3: In this court's experience, even those providers of free legal services that contract with DSS to represent tenants in eviction proceedings have a difficult time extracting from DSS the information they need to persuade the court to extend their client's time to pay the rent arrears. One might think that DSS would seek to be an active participant in the tenant's efforts to advocate for an extension, but this is far from the case.

Footnote 4: "A quarter of New York City residents don't have enough money for staples like housing and food, and many say they cannot afford to go to the doctor, according to a report that underscores the urgency of an affordability crisis elected officials are struggling to confront" (Benjamin Oreskes, As Poverty Rises in New York City, 1 in 4 Can't Afford Esssentials, NY Times, Feb. 26, 2025, available at 
https://www.nytimes.com/2025/02/26/nyregion/robin-hood-poverty-nyc.html [last accessed Apr. 9, 2025]).